UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCIA KIMBLE, individually, and on behalf of all others similarly situated,

Plaintiff,

v.

Case No. 2:24-cv-12987

USHEALTH GROUP, INC., USHEALTH ADVISORS, L.L.C., and FREEDOM LIFE INSURANCE COMPANY OF AMERICA,

Defendants.
_________________________________________/

# DEFENDANTS' MOTION TO COMPEL ARBITRATION

Defendants USHEALTH Group, Inc. ("USHG"), USHEALTH Advisors, LLC ("USHA"), and Freedom Life Insurance Company of America ("FLICA"), pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"), move to compel arbitration and to stay this proceeding under 9 U.S.C. § 3 until the arbitrator enters a final award. A brief in support of this Motion is attached.

Dated: June 18, 2025

GREENSPOON MARDER LLP

By: /s/ Roy Taub

Jeffrey A. Backman (Bar No. 662501)
Roy Taub (Bar No. 116263)
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
Telephone: 954-491-1120
Facsimile: 954-213-0140
jeffrey.backman@gmlaw.com

mary.torres@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

Douglas R. Sargent (Bar No. 82126)
The Franklin, 227 W. Monroe Street,
Suite 3950
Chicago, IL 60606
(773) 395-1601
doug.sargent@gmlaw.com
alejandra.albuerne@gmlaw.com

*Attorneys for Defendants*

## LOCAL RULE 7.1(A) STATEMENT

Pursuant to Local Rule 7.1(a), undersigned counsel for Defendants certifies that he conferred with Christopher Roberts and Jacob Ginsburg, counsel for Plaintiff Marcia Kimble, by telephone on June 3, 2025 regarding the grounds of this Motion and the requested relief. Counsel for Plaintiff advises that Plaintiff opposes the Motion.

*/s/ Roy Taub*
ROY TAUB

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCIA KIMBLE, individually, and on behalf of all others similarly situated,

Plaintiff,

Case No. 2:24-cv-12987

v.

USHEALTH GROUP, INC., USHEALTH ADVISORS, L.L.C., and FREEDOM LIFE INSURANCE COMPANY OF AMERICA,

Defendants.

______________________________________/

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should compel Plaintiff to submit her asserted claims to arbitration.

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

1. 9 U.S.C. § 3

2. *Glazer v. Lehman Bros.*, 394 F.3d 444 (6th Cir. 2005)

3. *Swiger v. Rosette*, 989 F.3d 501 (6th Cir. 2021)

4. *Fisher v. FCA US LLC*, No. 23-CV-10426, 2025 WL 582451 (E.D. Mich. Feb. 21, 2025)

5. *Nelums v. Am.'s Lift Chairs, LLC,* No. 1:22-CV-00739, 2023 WL 6161997 (N.D. Ohio Sept. 21, 2023)

## PRELIMINARY STATEMENT

Plaintiff attempts to assert a single cause of action against Defendants under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), alleging breach of the TCPA's prohibition on unsolicited telephone communications with numbers registered on the national do-not-call list. However, Plaintiff was texted because on November 6, 2022, she knowingly and voluntarily provided her telephone number and other personal information on a website at https://abc.rewards-locker.com (the "Site") and consented to receive the very text messages about which she complains. Each text message Plaintiff is suing over was allegedly sent on or after November 6, 2022. *See* Compl. at ¶¶ 39-41.

More importantly for this Motion, the text messages were made based upon a consent-based lead generated on the Site. When Plaintiff provided her information and made a submission on the Site, she not only consented to receive telephone calls from a list of marketing partners (which includes USHA), she also expressly agreed to the Terms & Conditions on the Site, which contain an arbitration agreement. Indeed, before she clicked on the "Continue" button on the Site to make her submission, Plaintiff was informed by the Site, "[b]y clicking below, I agree to . . . the <u>Terms & Conditions</u> (which include mandatory arbitration) . . . ." Moreover, the arbitration agreement provides a clear and unmistakable intention to delegate all questions of arbitrability to the arbitrator. Thus, under settled principles of law and

in furtherance of the strong federal policy in favor of enforcement of arbitration agreements, this Court should compel Plaintiff to proceed to arbitration.

## STATEMENT OF FACTS

On November 6, 2022, Plaintiff visited and made a submission on the Site. *See* Declaration of Roy Taub at ¶¶ 2-9. Counsel for USHA viewed the Site as it would have appeared on November 6, 2022 using the Wayback Machine Internet Archive (the "Wayback Machine") at https://archive.org/web/. *Id.* at ¶ 12. As seen using the Wayback Machine, to proceed through the Site to make a submission, the user must enter their email address and click a button labeled "Continue," which has language immediately above it stating, "By clicking below, I agree to receive relevant email from Rewards-Locker, the Terms & Conditions (***which include mandatory arbitration***), and the Privacy Policy," (emphasis added), as shown here:



*Id.* at ¶¶ 12-14. Only by entering their e-mail address and clicking the "Continue" button can the user advance to the next pages of the Site, and Plaintiff entered her email address and clicked the "Continue" button to advance to the next pages of the Site and made a submission at least two times, once on November 6, 2022, and another on November 12, 2022. *Id.* at ¶¶ 10-19, 23-24. The owner and operator of the Site, S44, LLC ("SHIFT44") produced "database entries showing Marcia Kimble's site visits in 2022, which includes the data inputted and shows the dates/times of her consents." *Id.* at ¶¶ 23-24, Exs. B & C thereto.

A "visual playback" using session data tracked by an industry leader in lead validation and verification, Jornaya, during Plaintiff's November 6, 2022 visit to the Site provides a visual reenactment of her visit. *See Id.* at ¶¶ 3, 8, Ex. A thereto (accessible at https://vp.leadid.com/playback/93308CED-3718-3E39-E356-45E731E39E6E/1673554645.8505?key=1667746695640). The Jornaya "Visual Playback" also allows one to enter information in fields to the left of the screen and to see if they match the information that was submitted during the lead event and recorded by Jornaya. Entering the information from the lead associated with Plaintiff (such as her name and telephone number) generates checkmarks showing that they match the information that was submitted during the lead event, as reflected below in the partial screenshots (with Visual Playback Data Overlay showing in which fields the input data match):




*Id.* at ¶ 30.[1]

As seen from the Jornaya "Visual Playback," and confirmed in SHIFT44's database entries, Plaintiff provided various information about herself, including her name, address, and telephone number, (313) 657-4318. *Id.* at ¶¶ 24, 30, Exs. A-C. Appearing directly before her on the screen was the below language signifying "consent to receive marketing and informational phone calls and text messages from Rewards-Locker and our Marketing Partners on the [telephone] number I provided," and a checkbox to signify Plaintiff's agreement "to be called and texted and that all my information is accurate as provided above":

[1] SHIFT44 produced a Jornaya Guardian TCPA Report for Plaintiff's additional visit and submission on the Site on November 12, 2022. *See id.* at ¶¶ 23, 29, Ex. G.




Plaintiff could not have made a submission on the Site without the above-depicted box being checked conveying her consent. *Id.* at ¶¶ 17-18. Starting no later than February 2022, and including on November 6 and 12, 2022, USHA was one of the Marketing Partners listed on the Site. *See id.* at ¶¶ 22, 28, Ex. F. Defendants learned that this month. *See id.* at ¶ 22. Plaintiff's submission on the Site generated a lead containing her name, telephone number, and other information. *Id.*, Ex. C.

As reflected in the Wayback Machine's archive of the Site, when clicking on the hyperlink for the "Terms & Conditions" on the Site, the Terms of Use open in a new browser window at https:// rewards-locker.com/tc.php. *Id.* at ¶¶ 14, 25, 27, Ex. D. The operative Terms of Use on the Site on November 6, 2022 began:

> These Terms of Use set forth the terms of your understanding with rewards-locker.com and how you may use the content located on the rewards-locker.com website, app or our social media sites (the "Website") (the Website and its owners shall be referred to as "we" or "us'). The Privacy Policy posted on our Website also forms part of these Terms of Use. Your use of this Website constitutes your acknowledgement that you have read, accept, and agree to be bound by these Terms of Use and any applicable laws therein. Please do not use this Website if you do not agree to our Terms of Use.

*Id.*, Ex. D at 1. The Site's Terms of Use also contain a mandatory arbitration provision (the "Arbitration Agreement"), which states, in relevant part, as follows:

> You agree that the Terms of Use will be governed by and construed in accordance with the laws of Texas, without regard to conflicts of law principles, and that any disputes under this Agreement will be submitted to binding arbitration under the Rules of Arbitration for the American Arbitration Association in Tarrant, Texas . . . .

*Id.* at 6.[2]

Both in their Answers and in the Rule 26(f) Joint Case Management Report, Defendants asserted that they would be investigating whether an arbitration agreement exists and reserved the right to move to compel arbitration if an agreement was located. *See* Dkt. No. 12 at 3-4, 5; Dkt. Nos. 8-10, Aff. Def. No. 26 ("Plaintiff's suit and the claims of any putative class member are barred to the extent they agreed to arbitrate the asserted claim(s) against Defendant."). On February 28, 2025, at the

---

[2] SHIFT44 also produced a copy of the Privacy Policy in effect on the Site on November 6, 2022, the date of Plaintiff's submission. Both documents match the corresponding documents reflected on the Wayback Machine archives from immediately before and after that date. *See id.* at ¶ 26, Ex. E.

Scheduling Conference, the Court raised that issue with the parties and counsel for Plaintiff stated "Plaintiff agrees that the defendants in this case have preserved their right to raise arbitrability." Ex. AA at 11:1-16. Co-counsel for Plaintiff added, "I think what Jake said is completely accurate. I just don't want to be in a position where they have the arbitration agreement . . . sit on it, we get to the point of class certification, and then they suddenly moved to compel arbitration. I don't think that's fair to our side, either." *Id.* at 12:5-16. The Court then directed that if Defendants "find an arbitration agreement," that they "bring it to plaintiff's attention within 30 days of when you find it . . . ." *Id.* at 12:17-20.

At that time, Defendants had known that Plaintiff's lead was submitted on, and was thus generated by, the Site, but had little additional knowledge. Plaintiff's lead had not been obtained directly from the operator of the Site, and Defendants did not know the identity of the company that owns and operates the Site, nor did they have a copy of the Terms on the Site, where arbitration agreements on such websites are normally located, because the Site was no longer on-line. Taub Decl. at ¶¶ 20 & 31. On March 4, 2025, counsel for Defendants was able to locate a copy of the Terms of Use on the Site in effect on November 6, 2022, and on March 13, 2025, Defendants learned for the first time the identity owner and operator of the Site is S44, LLC ("SHIFT44"). *Id.* at ¶ 32. On March 25, 2025, USHA issued a subpoena to SHIFT44 for documents about the Site. *Id.* at ¶ 22.

On March 27, 2025, consistent with the Court's direction to disclose to Plaintiff within 30 days of learning about an arbitration agreement, Defendants shared with counsel for Plaintiff copies of the Jornaya Guardian TCPA Report associated with Plaintiff's submission on the Site and the relevant Terms of Service on the Site, including the Arbitration Agreement. *See id.* at ¶ 33.

Counsel for Defendant first heard from SHIFT44 when its outside counsel reached out on April 14, 2025 in response to the subpoena served on her client. *Id.* at ¶ 21. Counsel advised that, based on SHIFT44's initial investigation, none of the Defendants were listed as marketing partners on the Site at the time of Plaintiff's submission. *See id.* Counsel for Defendants continued to investigate and obtained new information suggesting otherwise based on archived versions of other websites that appeared to be operated by SHIFT44. *Id.* This new information was presented and, on June 1, 2025, counsel for SHIFT44 advised that, in fact, USHA was listed as a marketing partner on the Site and other websites operated by SHIFT44 starting in February 2022, and including on November 6, 2022, the date of Plaintiff's submission on the Site. *Id.* at ¶ 22.

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

Section 4 of the FAA permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement.

9 U.S.C. § 4. Arbitration agreements are governed by and enforceable under the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991). "[T]he FAA governs the enforceability of arbitration clauses generally," "although state law may dictate the standards for generally applicable contract defenses . . . ." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 887 (6th Cir. 2002) (internal quotations omitted). The FAA and the strong federal policy favoring arbitration that it evidences require courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).[3] In light of the FAA's purpose, a court must "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible," because a "prime objective" of arbitration "is to achieve 'streamlined proceedings and expeditious results.'" *Preston*, *v. Ferrer*, 552 U.S. 346, 357-58 (2008) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth. Inc.*, 473 U.S.

---

[3] *See also Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) ("[C]ourts must rigorously enforce arbitration agreements according to their terms") (internal quotation omitted); *Glazer v. Lehman Bros*., 394 F.3d 444, 450 (6th Cir. 2005) ("[I]t is well-established that any doubts regarding arbitrability must be resolved in favor of arbitration, because there is a strong presumption in favor of arbitration under the FAA.") (internal citation omitted).

614, 633 (1985)). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

The Sixth Circuit has instructed that,

> [w]hen considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer*, 394 F.3d at 451.

## II. THE COURT SHOULD COMPEL ARBITRATION

### A. A Valid Written Arbitration Agreement Exists

Plaintiff entered into a valid agreement requiring her to arbitrate her claim against Defendants concerning calls or text messages resulting from the Site when she agreed to the Terms & Conditions on the Site, including the mandatory arbitration provision. While the Court should find that this is an issue that has been delegated to the arbitrator, even if the Court takes up this question in deciding whether arbitration can be compelled, it should find in the affirmative.

### 1. The Question of the Existence of an Arbitration Agreement With Plaintiff Has Been Delegated to the Arbitrator

As a threshold issue, parties to an arbitration agreement may "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (citations omitted). *See also Fisher v. FCA US LLC*, No. 23-CV-10426, 2025 WL 582451, *9 (E.D. Mich. Feb. 21, 2025) (Leitman, J.) ("The FAA, however, allows parties to agree that an arbitrator, rather than a court, will determine ''gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate . . . .") (quoting *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021)).

As another district court within this Circuit recently ruled, if parties to an arbitration agreement have clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator, then the court cannot override that intention and the arbitrator must decide these threshold issues, including whether a valid, written arbitration agreement exists. *See Nelums v. Am.'s Lift Chairs, LLC,* No. 1:22-CV-00739, 2023 WL 6161997, *4 (N.D. Ohio Sept. 21, 2023). *Accord Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court

thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 586 U.S. at 68.

Here, the Arbitration Agreement provides that the arbitrator – not a court – is to decide issues of arbitrability in providing that "any disputes under this Agreement will be submitted to binding arbitration under the Rules of Arbitration for the American Arbitration Association . . . ." Taub Decl., Ex. D at 6. The American Arbitration Association's ("AAA") Commercial Rules expressly reserve to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the *existence*, scope, or *validity* of the arbitration agreement or to the arbitrability of any claim or counterclaim . . . ." Ex. BB at R-7(a) (emphases added). Under controlling Sixth Circuit precedent involving AAA rules with identical language, "[t]he incorporation of these rules provides clear and unmistakable evidence that the parties agreed to arbitrate gateway arbitrability question." *Ciccio*, 2 F.4th at 583. In *Nelums*, the court held that similar arbitration agreement language "mean[s] that the agreement delegates the gateway question of arbitrability to an arbitrator," and compelled arbitration to have the arbitrator decide, among other things, whether there was a valid, written arbitration agreement. *Nelums*, 2023 WL 6161997 at *3-4.[4] Given the clear and unmistakable intent in the arbitration

[4] To the extent it is relevant, Texas law is the same. *See RSL Funding, LLC v. Newsome,* 569 S.W.3d 116, 121, 126 (Tex. 2018)*; Forest Oil Corp. v. McAllen,* 268

agreement to delegate gateway issues to the arbitrator, this Court should similarly compel Plaintiff to arbitrate the gateway question of the existence of an arbitration agreement.[5]

### 2. In the Alternative, the Court Should Find that Plaintiff Entered Into a Valid Arbitration Agreement

Nevertheless, if the Court is of the view that it is to decide the existence and validity of the Arbitration Agreement, it is evident that both are established here. The Terms of Use contain a governing law provision stating "the Terms of Use will be governed by and construed in accordance with the laws of Texas, without regard to conflicts of law principles." Taub Decl., Ex. D at 6. Texas law therefore governs.

"Texas law requires a contract to include 'an offer and acceptance, supported by consideration.'" *S. Tire Mart, LLC v. Gutierrez*, No. MO:21-MC-00022-DC, 2021 WL 6750914, *3 (W.D. Tex. Oct. 12, 2021) (quoting *Pasture Renovators, L.L.C. v. Lawson Cattle & Equip., Inc.*, 480 F. Supp. 2d 890, 893 (W.D. Tex. 2006)). All three requirements are present here. The operator of the Site, which collects and sells information to others, made Plaintiff an offer to provide services through the Site if Plaintiff agreed to, among other things, "the Terms & Conditions (which

---

S.W.3d 51, 61 (Tex. 2008); *Taylor Morrison of Tex., Inc. v. Skufca*, 650 S.W.3d 660, 683 (Tex. App.–Houston [1st Dist.] 2021).

[5] The delegation clause thus resolves this Motion. *Accord Nelums*, 2023 WL 6161997 at *4-5. In an abundance of caution, and to provide a complete analysis, Defendants also address the grounds in favor of compelling arbitration of Plaintiff's claims in the absence of an enforceable delegation clause.

contain mandatory arbitration), and the Privacy Policy," (Taub Decl. at ¶ 14), Plaintiff agreed to the Arbitration Agreement, and the Arbitration Agreement is supported by consideration. *See Lesure-Travis v. United HealthCare, Inc.*, No. 5-20-CV-1369-FB-RBF, 2021 WL 2935307, *3 (W.D. Tex. Apr. 5, 2021) (holding that, under Texas law, "the mutual promise to arbitrate is sufficient consideration to render the Agreement valid").

"The chief consideration when determining the validity of contractual terms—in contracts with or without a nexus to the internet—is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011). "[W]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Id.* at 268 (quoting *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)). In clicking the "Continue" button below the words, "By clicking below, I agree to receive relevant email from Rewards-Locker, the Terms & Conditions (which include mandatory arbitration), and the Privacy Policy," (Taub Decl. at ¶ 14), Plaintiff indisputably received notice of and assented to the Arbitration Agreement.

One of the primary means of forming a contract on the Internet is the "'clickwrap' (or 'click-through') agreement . . . ." *IT Strategies Group, Inc. v. Allday Consulting Group, L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) (quoting

*Hines v. Overstock.com*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009)). "A 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the website," and "[i]f the consumer does not accept the terms of the agreement, the website will not complete the transaction." *Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, *3 (N.D. Tex. Oct. 2, 2019). "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). *See also*, *e.g.*, *Phillips*, 2019 WL 4861435 at *4 ("[C]ourts routinely enforce clickwrap agreements . . . ."). The clickwrap agreements here – both to arbitrate and to provide consent to receive calls and text messages – as well as the referenced Terms & Conditions were conspicuous and clear (the text was hyperlinked) and thus placed Plaintiff on notice that she was agreeing to the Terms & Conditions, including the Arbitration Agreement. There is no way to avoid seeing the above-quoted language and providing the requested assent before being able to click the "Continue" button.

Courts regularly find that "[t]here is reasonable notice when a user is required to click a 'Continue' button and a statement is displayed directly above the button that informs users that by clicking 'Continue,' they are agreeing to the website's terms," particularly "when the terms of service are hyperlinked" and thus are in contrast with the rest of the text. *McKimmy v. OpenSea*, No. 4:22-CV-00545, 2023

WL 6370907, *2-3 (S.D. Tex. Mar. 22, 2023). This is particularly so when the statement expressly states one of the terms being agreed to is a mandatory arbitration provision. *See*, *e.g.*, *Sharman v. H&R Block*, No. 3:24-CV-1646-G-BW, 2025 WL 825658, *2-3 (N.D. Tex. Feb. 18, 2025), report and recommendation adopted, 2025 WL 824349 (N.D. Tex. Mar. 14, 2025); *Jackson v. World Wrestling Ent., Inc.*, No. 4:23-CV-0172-P, 2023 WL 3326115, *2-4 (N.D. Tex. May 9, 2023).

As one court explained, upon being informed that a proposed agreement incorporates additional terms by reference, the person entering into that agreement is obliged to review those additional terms because he or she will be charged with assent to them if they decide to enter into the proposed agreement:

> Mireskandari was presented with Engagement Agreements that expressly state that they incorporate the Terms and Conditions by reference. This notified Mireskandari of the terms because a reasonably prudent person would have seen the notice. Given such notice, it became Mireskandari's burden to review the Terms and Conditions, perhaps by . . . visit[ing] the website. When Mireskandari chose to sign the Engagement Agreements without doing so, he agreed to be bound by the unread Terms and Conditions; knowledge and assent to the Terms and Conditions is therefore imputed to Luxeyard and him.

*Luxeyard, Inc. v. Offit Kurman, P.A.*, No. CV H-20-1658, 2020 WL 3542779, *5 (S.D. Tex. June 30, 2020).[6]

---

[6] *Cf. Raw Life Organics LLC v. SBL, LLC*, No. 20-61944-CIV, 2021 WL 217765, *5 (S.D. Fla. Jan. 6, 2021) (recommending arbitration be compelled after finding "hyperlink to the Terms and Conditions as well as a sentence stating that the parties' agreement is subject to Terms and Conditions" was sufficiently conspicuous so that, "even if the hyperlink to the Terms and Conditions were inoperable, Plaintiff was

Given the layout and text of the Site, the hyperlinked Terms and Conditions, and particularly the express notice of agreement to mandatory arbitration, "a 'reasonably prudent smartphone user' like Plaintiff would know that by clicking 'Continue' . . . or checking the box affirming that [s]he agrees, [s]he is assenting to be bound by the provisions of the Terms of Service, including the arbitration agreement contained therein." *McKimmy*, 2023 WL 6370907 at *3. Given the explicit warning that clicking the "Continue" button constitutes an acceptance of the "Terms & Conditions (which include mandatory arbitration)," Plaintiff entered into a "clickwrap" agreement because notice and assent are clearly established.[7]

Moreover, a "visual playback" using session data tracked during Kimble's visit to the website provides visual evidence of her submission, which could not have been done unless she clicked "Continue" after being told that by so clicking, "I agree

---

put on inquiry notice that the parties' agreement was subject to Terms and Conditions," "and was obliged to seek them out"), report and recommendation adopted, 2021 WL 217076 (S.D. Fla. Jan. 21, 2021).

[7] *See, e.g., Bell*, 2020 WL 5639947 at *6 (finding "Website's design is such that the hyperlink to the terms and conditions is sufficiently conspicuous to put a reasonably prudent user on inquiry notice of the terms of the contract" because "it is nearly impossible that any user would not see" "[t]he sentence regarding the applicability of the Terms and Conditions, which includes a hyperlink to the Terms and Conditions and is placed directly above the 'Continue' button," "before hitting 'Continue'"); *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020) ("[W]hile [the Site] does not ask its users to check an "I Accept" box, as is the case with a typical clickwrap agreement, the placement of an explicit warning directly below a log-in button has a similar psychological effect. And clickwrap agreements are routinely enforced by the courts.").

to . . . the Terms and Conditions (which include mandatory arbitration), and the Privacy Policy. . . ." Taub Decl. at ¶ 14. Plaintiff therefore cannot dispute that she was given notice through the clickwrap language on the Site of the Terms & Conditions and, by clicking the "Continue" button, she agreed to the Terms & Conditions and, thus, there is a valid agreement to arbitrate.[8]

### B. Plaintiff's Claims Raise Arbitrable Issues

As noted above, among the gateway issues that parties may delegate to an arbitrator is "whether their agreement covers a particular controversy," and the Arbitration Agreement contains such a delegation by incorporating the AAA Rules. *Ciccio*, 2 F.4th at 583. That should be the end of the analysis before this Court. Only in the event the Court finds the question of the arbitrability of Plaintiff's claims has not been delegated (unlike in *Rent-A-Center*, *Ciccio*, and *Nelums*, among others),

[8] To the extent the Court addresses the question of whether an arbitration agreement was made, as opposed to finding it has been delegated, and believes a factual issue exists as to the making of an agreement, a summary trial is required to resolve that factual issue under 9 U.S.C. § 4. In that event, "[t]he Federal Arbitration Act requires the district court to 'proceed summarily to the trial' of the disputed fact questions. The parties may not address other issues, including merits issues, before the court resolves these formation questions and [the] motion to compel." *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021) (quoting 9 U.S.C. § 4). Defendants expressly demand that any such trial be before a jury. So that the issues can be sufficiently developed at trial, the Court should permit limited discovery, including expert discovery, specifically relating to the determination of whether Plaintiff made a submission on the Site and thereby entered into the agreement to arbitrate, such as Plaintiff's browser history, a forensic examination of her personal devices, and her deposition. *Accord Boykin*, 3 F.4th at 844.

and the Court must decide the question, it should answer in the affirmative.

In determining the scope of the arbitration clause, courts look at the parties' intent to submit the dispute to arbitration, starting at the language of the arbitration provision, and construing any doubt in favor of arbitrability in accordance with the strong federal policy favoring arbitration. *See, e.g., Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). The Arbitration Agreement states, in relevant part:

> You agree . . . that any disputes under this Agreement will be submitted to binding arbitration under the Rules of Arbitration for the American Arbitration Association in Tarrant, Texas. . . . You agree and acknowledge that all claims must be resolved in accordance with this Section.

Taub Decl., Ex. D at 6.

The Privacy Policy, which "also forms part of these Terms of Use," (*id.* at 1), states that personal information submitted on the Site is shared with, among others, "telemarketers," and further states, in connection with such "THIRD PARTIES," "[a]ny dispute over privacy or security will be subject to this Privacy Policy and our Terms of Use." *Id.*, Ex. E at 1.

Under Texas law, "[t]he phrase 'brought . . . under this Agreement' is akin to the wording of narrower forum-selection clauses, such as those applying to claims 'arising out of' an agreement," and applies to claims where "the Agreement must be

interpreted to determine the validity of [plaintiff's] lawsuit . . . ." *Buc-ee's, Ltd. v. Bucks, Inc.*, 262 F. Supp. 3d 453, 460–61 (S.D. Tex. 2017). In other words, Plaintiff's TCPA claim against Defendants is brought under her Agreement with the operator of the Site because her consent to be called under the Terms and Conditions and Privacy Policy, as made clear on the Site, is a defense to her claim.[9]

This is also confirmed by the language in the Privacy Policy that "[a]ny dispute over privacy or security will be subject to this Privacy Policy and our Terms of Use," which are subject to the Arbitration Agreement. Taub Decl., Ex. E at 1. The Arbitration Agreement also confirms this broad scope when it states "all claims must be resolved in accordance with this Section." *Id.*, Ex. D at 6. Plaintiff's TCPA claim concerns her opt-in and the consent, which she submitted on the Site, to be called or texted by the listed marketing partners, including USHA, which is what led to the calls at issue. For all these reasons, there should be no doubt that Plaintiff's

---

[9] *Accord Buc-ee's*, 262 F. Supp. 3d at 461; *Terraspan, LLC v. RAVE, LLC*, No. 3:13-CV-0816-K, 2012 WL 6115721, *3 (N.D. Tex. Dec. 10, 2012) ("Where enforcement of a provision in the parties' agreements is a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum-selection clause."); *Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 267, 270-71 (Tex. 1992) (holding arbitration provision that "[a]ll questions subject to arbitration under the Contract may be submitted to arbitration" applied to "claims arising out of a construction contract dispute" because they were "factually intertwined" with underlying contract).

TCPA claim is arbitrable, but to the extent there are any doubts, the FAA requires that they be "resolved in favor of arbitration." *Mitsubishi*, 473 U.S. at 626.[10]

### C. The Question of Whether Defendants Have Standing to Enforce the Arbitration Agreement Has Also Been Delegated to Arbitration

Under clear Sixth Circuit case law, the issue of Defendants' standing to enforce the arbitration agreement has also been delegated to the arbitrator under controlling case law. *See Swiger*, 989 F.3d at 507 ("[W]hether Rees can enforce the arbitration agreement against Swiger presents a question of arbitrability that Swiger's arbitration agreement delegated to an arbitrator."). *See also*, *e.g.*, *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 883 (6th Cir. 2021); *Ross v. Nissan of N. Am., Inc.*, 728 F. Supp. 3d 841, 851 (M.D. Tenn. 2024); *Nelums*, 2023 WL 6161997 at *5; *Ford-Allemand v. Piedmont Nat. Gas Co., Inc.*, No. 1:20-CV-00192-MRB, 2022 WL 3576227, *3 (S.D. Ohio Aug. 19, 2022); *Cunningham v. Ford Motor Co.*, No. 21-CV-10781, 2022 WL 2819115, *4 (E.D. Mich. July 19, 2022). Accordingly,

---

[10] Moreover, the fact that Plaintiff's claim is a statutory claim does not place it outside the scope of a valid arbitration agreement. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA," "'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi*, 473 U.S. at 628). "[T]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). There is no such intention with respect to the TCPA.

under clear and settled law, this issue is not before the Court.[11]

### D. Defendants Have Not Waived their Right to Seek Arbitration

Finally, Defendants cannot be deemed to have waived the right to enforce the Arbitration Agreement against Plaintiff. As this Court explained, while "[a] party may waive an agreement to arbitrate by . . . taking actions that are completely inconsistent with any reliance on an arbitration agreement," "the waiver of the right to arbitration is not to be lightly inferred," and, "[i]nstead, '[t]he strong presumption in favor of arbitration works against finding waiver in cases other than those with the most compelling fact patterns.'" *Fisher*, 2025 WL 582451 at *4 (quoting *United States ex rel. Dorsa v. Miraca Life Scis., Inc.*, 33 F.4th 352, 357 (6th Cir. 2022); *Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 494 (6th Cir. 2020); *JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393 (6th Cir. 2008)).

"[A] key circumstance in the waiver analysis is whether the defendant 'knew of its right to compel arbitration' when it" acted, and "[w]hether the defendant had such knowledge is a critical factor because, in the arbitration context (as elsewhere),

[11] Even though this issue has been delegated to the arbitrator, for the avoidance of any doubt, Defendants have standing to enforce the Arbitration under the doctrines of third-party beneficiary, estoppel, and as alleged principals or agents of USHA. *See* Compl. at ¶¶ 58-70, 89-90. The Terms and Conditions and Privacy Policy, like the express language on the submission page, make clear that a visitor making a submission on the Site authorizes SHIFT44 to share their personal information, including telephone numbers, to third-party advertisers/marketing partners (such as USHA), which obtain the benefit of the Arbitration Agreement between SHIFT44 and, in this case, Plaintiff. *See* Taub Decl., Exs. D-F.

'[w]aiver ... 'is the *intentional* relinquishment or abandonment of a *known* right.''" *Id.* at *5 (quoting *Morgan v. Sundance*, 596 U.S. 411, 417 (2022); *Newirth by and through Newirth v. Aegis Senior Comms., LLC*, 931 F.3d 935, 938 (9th Cir. 2019)).

From the outset of this case, Defendants asserted that they would be investigating whether an arbitration agreement exists and reserved the right to move to compel arbitration if an agreement was located. *See* Dkt. No. 12 at 3-4, 5; Dkt. Nos. 8-10 at Aff. Def. No. 26. The potential existence of an arbitration agreement was the main focus of discussion at the Scheduling Conference just a few short months ago on February 28, 2025. *See* Ex. AA at 4:25-13:22. Plaintiff agreed Defendants had not waived the right to enforce arbitration and would not be waiving arbitration by participating in discovery, and the Court directed Defendants to "bring [any arbitration agreement] to plaintiff's attention within 30 days of when you find it." *Id.* at 10:8-21, 11:1-16, 12:5-20.

That was done on March 27, 2025, after Defendants succeeded in locating an archived copy of the Terms and Conditions on the Site in effect on November 6, 2022, and before they had received any response from the recently-identified SHIFT44 to a served subpoena. *See* Taub Decl. at ¶¶ 32-34. To ensure that Defendants had a good faith basis to seek enforcement of the Arbitration Agreement regarding Plaintiff's claims over text messages from USHA, Defendants believed they needed evidence that USHA was one of the listed marketing partner on the Site

for whose benefit SHIFT44 obtained assent to the Arbitration Agreement.[12]

SHIFT44's initial investigation, however, led it to report that none of the Defendants were listed marketing partners on November 6, 2022. As that would have been quite unusual, counsel for Defendants continued to investigate and communicate with counsel for SHIFT44. Ultimately, after sharing newly-obtained information, on June 1, 2025, counsel for SHIFT44 advised that USHA was, indeed, listed as a marketing partner on the Site since February 2022, including on November 6, 2022. *See* Taub Decl. at ¶¶ 21-22.

This Motion follows shortly thereafter, and certainly within the thirty-day period directed by the Court once Defendants were satisfied they had a good faith basis to assert Plaintiff's claims were subject to a written arbitration agreement that Defendants could enforce. In other words, Defendants "could not reasonably have filed a motion to compel arbitration" before then because "[t]o file such a motion, [Defendants] would have had to know, at an absolute minimum," whether they were included in the applicable list of marketing partners, because, "[w]ithout knowledge of those terms, [Defendants] would not have been able to determine (much less present a reasoned argument) that a particular claim being asserted by a Plaintiff

---

[12] Unfortunately, the Site is not currently on-line and there is no archived or historic version of the list of marketing partners on the Site (such as on the Wayback Machine). Counsel for Plaintiff correctly surmised a few weeks ago that that was the continuing obstacle Defendants faced that prevented them from filing a motion to compel arbitration. *See* Taub Decl. at ¶¶ 20, 31, 35.

here was subject to arbitration." *Fisher*, 2025 WL 582451 at *6.

Far from presenting an especially "compelling fact pattern[ ]" that would be required to override "[t]he strong presumption in favor of arbitration," (*JPD*, 539 F.3d at 393), the "totality of the circumstances" here points to Defendants not acting inconsistently with the intent to seek arbitration. As in *Fisher*, Defendants raised arbitration as an affirmative defense and noted the need to investigate and conduct discovery to determine whether there is an enforceable arbitration agreement. *See* 2025 WL 582451 at *7. And, even more in favor of a lack of any waiver than in *Fisher*, Defendants did not file a motion to dismiss or seek any affirmative relief from the Court before this Motion. Defendants were initially given inaccurate information, and it was not until June 1, 2025 that they learned the Arbitration Agreement applies to Plaintiff's claims against them, as they are based on text messages by USHA. Accordingly, the Court should find Defendants have not waived the right to enforce the Arbitration Agreement.

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the arbitration of Plaintiff's claims and staying the proceedings under Section 3 of the FAA until the arbitrator enters a final award.

Dated: June 18, 2025

GREENSPOON MARDER LLP

By: */s/ Roy Taub*
Jeffrey A. Backman (Bar No. 662501)

Roy Taub (Bar No. 116263)
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
Telephone: 954-491-1120
Facsimile: 954-213-0140
jeffrey.backman@gmlaw.com
rene.vazquez@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

Douglas R. Sargent (Bar No. 82126)
The Franklin, 227 W. Monroe Street,
Suite 3950
Chicago, IL 60606
(773) 395-1601
doug.sargent@gmlaw.com
alejandra.albuerne@gmlaw.com

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 18, 2025, a true and correct copy of the foregoing was electronically filed on the Court's CM/ECF document filing system, which will send notice of filing and a service copy to all counsel of record.

*/s/ Roy Taub*
ROY TAUB